UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

WANDA BAEZ, SIIDE GIL-FREDERICK,
DANIELLE JOHNSON, and RESIDENTS TO
PRESERVE PUBLIC HOUSING, individually and on
behalf of all similarly situated,

                                        Plaintiffs,

                  - against -

The NEW YORK STATE OFFICE OF
TEMPORARY AND DISABILITY ASSISTANCE,
the NEW YORK CITY HOUSING AUTHORITY,

                                        Defendants.

———————————————————————— x

1:24-CV-03282

**CLASS ACTION
COMPLAINT**

Plaintiffs, by and through their attorneys, Lincoln Square Legal Services Inc., upon personal

knowledge as to themselves and upon information and belief as to all other matters, allege as

follows:

## PRELIMINARY STATEMENT

1.      This is a class action complaint brought to remedy race and national origin

discrimination, both by intent and impact, against Black and Hispanic or Latino public and

subsidized housing tenants in violation of the Fair Housing Act (FHA), as amended, 42 U.S.C. §§

3601 et seq.; Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq.;

and New York State Human Rights Law, N.Y. Exec. Law § 296. The complaint is also brought to

remedy source of income discrimination in violation of New York State Human Rights Law, N.Y.

Exec. Law § 296.

1

2.     Defendants New York State Office of Temporary and Disability Assistance (OTDA) and New York City Housing Authority (NYCHA) individually and together engaged in practices constituting a denial of housing, discrimination in the terms, conditions, or privileges of rental of a dwelling, and publication of notice, statement, or advertisement with respect to rental of a dwelling that indicates discrimination on the basis of race and/or national origin in violation of the FHA and Title VI. Defendant NYCHA engaged in negligent practices that breached its duty to residents pursuant to federal regulation and caused them injury.

3.     Plaintiffs seek to certify a class of Black and Hispanic or Latino NYCHA residents who experienced economic hardship during the pandemic and accrued rental arrears from March 2020 onward. These class members were eligible for assistance through the New York State Emergency Rental Assistance Program (ERAP) and for a review and adjustment of their monthly rent. They were harmed by Defendants' policies, which discriminated against the class because of their race, national origin, and/or source of income.

4.     NYCHA is the largest public housing authority in North America. Together, Black and Hispanic or Latino residents make up the vast majority of the population served by NYCHA.

5.     Data has shown that Black and Hispanic or Latino New Yorkers, and by implication NYCHA residents, were disproportionately harmed by the COVID-19 pandemic — experiencing higher rates of economic loss and hardship compared to white New Yorkers.

6.     NYCHA, as a public housing authority receiving federal funding and subject to federal regulation, must consider such hardship when calculating the monthly portion of rent owed by residents. This amount generally cannot exceed 30 percent of a household's income.

7.      New York State received federal funding to implement ERAP, which was intended to help renters experiencing hardship due to the pandemic. The State made OTDA responsible for approving ERAP applications and administering the funds accordingly.

8.      In its administration of ERAP, OTDA categorically deprioritized both occupants of government-funded subsidized public housing authorities and recipients of government-funded housing subsidies from receiving funding made available to similarly situated households in private, non-subsidized housing. In doing so, OTDA rendered one of New York City's most vulnerable groups ineligible to receive assistance until all other eligible populations had received assistance.

9.      NYCHA residents who would have been eligible to apply for ERAP were intentionally discouraged from doing so due to Defendant OTDA's prominently advertised deprioritization of public and subsidized housing applicants. Those NYCHA residents who did apply despite the deprioritization policy were left pending by Defendant OTDA for more than two years, if not denied outright. Some remain pending nearly three years after the application portal opened.

10.     Only once ERAP assistance had been administered to non-subsidized applicants did Defendants NYCHA and OTDA collaborate on a process to deliver assistance to some public and subsidized NYCHA residents, who had not known of or disregarded the admonishment not to apply in the first place.

11.     As of April 2024, only 15,000 NYCHA families have been approved for ERAP assistance, out of 39,000 who applied and despite there being approximately 73,000 families who have fallen behind on rent during and following the pandemic.

12.     Additionally, NYCHA, despite being made aware of residents' financial hardship via their ERAP applications as well as an influx of requests for recertification, failed to timely recertify their incomes and recalculate monthly rent payments to reflect this hardship. This meant that NYCHA residents owed rent payments amounting to more than 30 percent of their income for extended periods of time.

13.     Combined, Defendants' practices and policies have foreseeably had a disparate impact on Black and Hispanic or Latino NYCHA residents.

14.     Defendants' practices and policies have disproportionately caused Plaintiffs and those similarly situated to fall behind on rent, leading to years of emotional distress. At least, one individual Plaintiff and those similarly situated also live in fear of of having eviction or consumer debt proceedings brought against them and their families.

15.     NYCHA has subsequently initiated a series of consumer debt actions against former NYCHA residents, including two individual Plaintiffs, for the unpaid, though miscalculated rent. NYCHA has also begun to file for evictions against current NYCHA residents who owe the highest dollar amounts and did not apply for ERAP.

16.     Unless enjoined by this Court, Defendant NYCHA will seek to evict families and recover millions of dollars in miscalculated rental arrears, which ERAP assistance could have covered if not for Defendants' discriminatory administration of the program.

## **VENUE**

17.     Venue is proper in this judicial district because it is where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred. See 28 U.S.C. § 1391(b).

## **JURISDICTION**

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims arising under New York State law.

## PARTIES

19.     Plaintiff Wanda Baez resides at 120 Bellamy Loop, #13D, Bronx, New York 10475. From 1995 to 2022, Ms. Baez resided in the Throggs Neck Houses, at 2773 Dewey Avenue, Apt #1A, Bronx, New York. Throggs Neck Houses are managed by Defendant NYCHA. Ms. Baez experienced financial hardship during the pandemic. Under the federal guidelines, Ms. Baez should have been eligible for ERAP; however, under New York State law she was ineligible for emergency rental assistance because she was subsidized when she applied. Ms. Baez applied for ERAP in August 2021. She did not realize that she was ineligible. Her application remains pending. Because of Defendants' discriminatory policies, Ms. Baez was unable to benefit from ERAP during the height of the COVID-19 pandemic. Defendant NYCHA also failed to recertify Ms. Baez despite having notice of her financial hardship. Ms. Baez amassed over $46,000 in rent between 2020 and 2022. Defendant NYCHA subsequently filed a consumer debt action against Ms. Baez for the unpaid, miscalculated amount of rent. That case is still pending.

20.     Plaintiff Siide Gil-Frederick resides at 118 Avenue D, New York, NY 10009. Ms. Gil-Frederick resides in the Jacob Riis Houses. Jacob Riis Houses are managed by Defendant NYCHA. Ms. Gil-Frederick experienced financial hardship during the pandemic. Under the federal guidelines, Ms. Gil-Frederick should have been eligible for ERAP; however, under New York State law she was ineligible for emergency rental assistance because Ms. Gil-Frederick was subsidized when she applied. Ms. Gil-Frederick applied for ERAP in June 2021. She did not realize that she was ineligible. Her application remained pending for more than two years until November

13, 2023. Because of Defendants' discriminatory policies, Ms. Gil-Frederick was unable to benefit from ERAP during the height of the COVID-19 pandemic. Ms. Gil-Frederick has amassed more than $25,000 in rent since 2020 and is at risk of being evicted.

21.   Plaintiff Danielle Johnson resides at 25-44 97th Street in East Elmhurst, Queens, New York 11369. From 1993 until 2021, Ms. Johnson resided in the Astoria Houses, at 4-24 Astoria Blvd., Apt #3F, Astoria, Queens, New York. The Astoria Houses are managed by Defendant NYCHA. Ms. Johnson experienced financial hardship during the pandemic. Under the federal guidelines, Ms. Johnson should have been eligible for ERAP; however, under New York State law she was ineligible for emergency rental assistance because Ms. Johnson was subsidized when she applied. Despite meeting the eligibility requirements for ERAP, Ms. Johnson never received information about or was made aware of ERAP, and as such was chilled from applying. Because of Defendants' discriminatory policies, Ms. Johnson was unable to benefit from ERAP during the height of the COVID-19 pandemic. Ms. Johnson amassed more than $28,000 in rent between 2020 and 2021. Defendant NYCHA subsequently filed a consumer debt action against Ms. Johnson to recover unpaid rent. That case is still pending.

22.   Plaintiff Residents to Preserve Public Housing (RPPH) is a collective organization of tenants who reside in public housing across the five boroughs of New York City. RPPH is an advocacy group for public housing residents that organizes its members to participate in housing policy decision-making in the City centered on preserving public housing. Because of Defendants' discriminatory policies, including failing to provide emergency rental assistance to RPPH's individual members even as those members experienced severe financial hardship during the pandemic, RPPH's efforts to preserve access to public housing were frustrated. More specifically, the individual members were so consumed with their day-to-day survival and that of their family

members that their bandwidth to participate in large-scale organizing was diminished, affecting the larger group's efforts to organize, advocate, and agitate for the preservation of public housing.

23.     Defendant Office of Temporary and Disability Assistance (OTDA) is a government agency duly organized and existing under the laws of the State of New York, with its principal office located at 40 North Pearl Street, Albany, New York. OTDA is responsible for providing financial assistance and support to eligible families and individuals. Among these programs, OTDA is responsible for administering the New York State Emergency Rental Assistance Program (ERAP), including determining if citizens are eligible.

24.     Defendant New York City Housing Authority (NYCHA) is a municipal housing agency duly organized and existing under the laws of the State of New York, with its principal office located at 90 Church Street, New York, New York. NYCHA is responsible for administering federally-assisted public and subsidized housing to low-income families and individuals throughout New York City.

## CLASS ALLEGATIONS

25.     Plaintiffs bring this action on behalf of all former and current NYCHA residents, including residents of public housing and those receiving housing subsidies, who accrued rental arrears from March 2020 onward because they experienced hardship during the pandemic. These class members were eligible for ERAP assistance and for recalculation of their monthly rent, and were harmed by Defendants' discriminatory policies.

26.     Plaintiffs reserve the right to establish additional sub-classes of plaintiffs as appropriate.

27.     This action is properly maintained under Federal Rules of Civil Procedure 23(a)(1)-(4) and (b)(3) and satisfies the requirements thereof.

28.     NYCHA serves a population of more than 528,000 residents.[1] As of June 6, 2023, NYCHA had submitted ERAP applications totaling more than $128 million on behalf of 35,389 households, none of which had been approved due to OTDA's deprioritization policy, which expressed a preference for unsubsidized tenants.[2] As November 2023, more than 73,000 NYCHA households collectively owed an estimated $533 million dollars in rental arrears accrued during the pandemic,[3] indicating that there are also likely thousands of class members who were chilled from applying for ERAP. As such, the class is sufficiently numerous that joinder of all class members in a single action would be impractical per Federal Rule of Civil Procedure 23(a)(1).

29.     Per Federal Rule of Civil Procedure 23(a)(3), the claims of the named Individual Plaintiffs are typical of members of the class. All individual plaintiffs and class members are similarly affected by Defendants' wrongful conduct in violation of federal law and regulation as complained of herein.

30.     As required by Federal Rule of Civil Procedure 23(a)(4), Individual Plaintiffs will fairly and adequately protect the interests of the class. No Individual Plaintiff has any interest adverse to any member of the class they seek to represent.

---

[1]   *NYCHA 2023 Fact Sheet*, New York City Housing Authority, 1 (Apr. 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/NYCHA-Fact-Sheet-2023.pdf.

[2]   *Mayor's Management Report*, City of New York, 379 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

[3] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha; *Testimony from NYCHA's Interim Chief Executive Officer Lisa Bova-Hiatt*, *Preliminary Budget Hearing – Public Housing,* New York City Council Committee on Public Housing, 1 (Mar. 13, 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/2023-preliminary-budget-testimony-FINAL.pdf ("Rent arrears . . . hav[e] nearly quadrupled since 2019, when arrears stood at $125 million.").

31.     This action is certifiable under Federal Rule of Civil Procedure 23(b)(2) as Defendants have acted or refused to act on grounds generally applicable to the entire class. Final injunctive relief or declaratory relief is appropriate respecting the class as a whole.

32.     Common questions of law and fact exist as to all members of the class, as required by Federal Rule of Civil Procedure 23(a)(2), and such questions substantially predominate over any question affecting any individual Plaintiff of the class, making the action alternatively certifiable under Federal Rule of Civil Procedure 23(b)(3).

33.     Common questions of law and fact include, but are not limited to, the following:

a.   Whether Defendants' acts, policies, and practices relating to the expression of a preference for non-subsidized persons in the administration of ERAP constitutes discrimination, both by intent and impact, based on race and/or national origin in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq.;

b.   Whether Defendants' acts, policies, and practices relating to the expression of a preference for non-subsidized persons in the administration of ERAP constitute discrimination, both by intent and impact, based on race, national origin, and/or source of income in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296;

c.   Whether Defendant NYCHA owed a duty to its residents to initiate the Interim Recertification process upon notice of residents' pandemic-related hardship, and/or of residents' ERAP application materials, which by implication indicate pandemic-related hardship;

d.  Whether Defendant NYCHA breached its duty by failing to initiate the Interim Recertification process upon notice of residents' pandemic-related hardship and/or of residents' ERAP application materials; and

e.  Whether Defendant NYCHA's failure to initiate the Interim Recertification process upon notice of residents' pandemic-related hardship and/or of residents' ERAP application materials caused residents to be charged more for monthly rent than is allowed by regulation.

## FACTUAL ALLEGATIONS

### Legal Frameworks for Federally- and State-Funded COVID-19 Rental Assistance

*Federal Statutory Framework*

34.    In response to COVID-19, Congress passed the Consolidated Appropriations Act, 2021.[4]  Section 501 of Division N of the Act created an Emergency Rental Assistance program (hereinafter "ERA 1").

35.    ERA 1 appropriated 25 billion dollars to be distributed to eligible grantees throughout the country.[5] Under ERA 1, eligible counties, towns, and municipalities received a federal allocation of resources to use no less than 90 percent of funds received toward the payment of rental arrears, utilities, home energy arrears, and other housing related expenses incurred due to the COVID-19 outbreak.[6]

36.    ERA 1 defined eligible households as households with one or more individuals who are obligated to pay rent on a residential dwelling and in which the eligible grantee determines that (i) one or more individuals within the household has "qualified for unemployment benefits or

---

[4] Pub. L. No. 116-260.

[5] *Id.* § 501(a)(1).

[6] *Id.* §§ 501(k)(2), 501(c)(2)(A).

experienced a reduction in household income, incurred significant costs, or experienced other financial hardship due, directly or indirectly, to COVID-19;" (ii) one or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability, which may include, "a past due utility or rent notice or eviction notice, unsafe or unhealthy living conditions, or any other evidence of such risk as determined by the eligible grantee; and (iii) the household has a household income that is not more than 80 percent of the area median income ("AMI") for the household.[7]

37.    ERA 1 directed eligible grantees to prioritize consideration of applicants of an eligible household that had (1) an income that does not exceed fifty percent of the AMI and/or (2) contain at least one individual who has been unemployed for at least 90 days up to the as of the date of the application.[8] ERA 1 permitted eligible grantees to further prioritize applications, "including to eligible households in which 1 or more individuals within the household were unable to reach their place of employment or their place of employment was closed because of a public health order imposed as a direct result of the COVID-19 public health emergency."[9]

38.    The American Rescue Plan Act of 2021 appropriated an additional 21.55 billion dollars for the Emergency Rental Assistance Program (hereinafter "ERA 2").  These funds would remain available until September 30, 2027 for the same purposes as ERA 1.[10]

39.    ERA 2 limited the total amount of financial assistance an eligible household could receive (when combined with any financial assistance provided under ERA 1) to a period of eighteen months, three months more than the fifteen months total allowed under ERA 1 (three of

---

[7] *Id.* § 501(k)(3)(A).

[8] *Id.* § 501(c)(4)(A).

[9] *Id.* § 501(c)(4)(B).

[10] Pub. L. No. 117-2, § 3201(a)(1).

the fifteen months under ERA 1 were subject to availability of funds and only if necessary to ensure housing stability for a household).[11]

40.     ERA 2 defined eligible households similarly to ERA 1, only altering the income qualifications for eligible households. Under ERA 2, the household must be "a low-income family (as such term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C 1437a(b))."[12]

41.     The Treasury Department ("Treasury") advised that an eligible household that occupies a federally subsidized property or receives federal rental assistance may receive assistance from ERA, as long as ERA 1 funds were not applied to costs that have been or will be reimbursed under any other federal assistance. Per Treasury's guidance, "grantees must not refuse to provide assistance to households on the basis that they occupy such [subsidized] properties or receive such assistance, due to the disproportionate effect such a refusal could have on populations intended to receive assistance under the ERA and the potential for such a practice to violate applicable law, including Title VI, Section 504, and the Fair Housing Act."[13]

42.     Aside from these requirements, states and localities had flexibility in designing and structuring their ERA programs.

43.     Ultimately, New York State received $1.5 billion in ERA 1 funding from the Consolidated Appropriations Act and $1.4 billion in ERA 2 funding from the American Rescue Plan, for a total of $2.9 billion in federal funds.

*New York's Statewide Statutory Framework*

---

[11] *Compare id.* § 3201(d)(1)(A)(ii), *with* Pub. L. No. 116-260, § 501(c)(2)(A).

[12] Pub. L. No. 117-2, § 3201(f)(2).

[13] *Emergency Rental Assistance Program: FAQs*, U.S. Department of the Treasury (last updated July 6, 2022), https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/emergency-rental-assistance-program/faqs.

44.     On April 16, 2021, New York State enacted the COVID-19 Emergency Rental Assistance Program of 2021, codified at 2021 N.Y. Laws Ch. 56, part BB, subpart A, and later amended by 2021 N.Y. Laws Ch. 417, Part A ("the ERAP Law").[14] The ERAP Law authorized and directed the commissioner of OTDA to implement a program of rental and utility assistance ("ERAP") for those eligible under the Law.[15]

45.     The program was funded by the Federal Emergency Rental Assistance Program, and any other federal funds made available for that purpose as well as any state funds appropriated for the program.[16]

46.     The ERAP Law authorized OTDA to administer payments towards rental and utility arrears accrued on or after March 13, 2020 to eligible applicants.[17] Specifically, up to twelve months of rental and/or utility assistance arrears and three months of prospective rental assistance could be paid on behalf of an eligible household.[18] Only rent-burdened households (defined as a household for which the monthly rental obligations are 30 percent or more of the household's gross income) were eligible to receive prospective rent payments.[19] Payments were to be administered directly to landlords and utility providers.[20]

47.     Under the ERAP Law, OTDA was required to determine eligibility consistent with the following:

---

[14] COVID-19 Emergency Rental Assistance Program of 2021, N.Y. Laws, ch. 56, part BB, subpart A (2021), *amended by* N.Y. Laws, ch. 417, part A (2021).

[15] *Id.* §§ 2(1), 3(1).

[16] *Id.* § 3(2). In addition to the $2.9 billion in federal funding, New York State contributed $1.6 billion in state funds as of June 2023. *See New York State Rent Relief Update: Spotlight on New York City*, Office of the New York State Comptroller, 1 (July 2023), https://www.osc.ny.gov/files/reports/osdc/pdf/report-5-2024.pdf.

[17] COVID-19 Emergency Rental Assistance Program of 2021, § 9(1).

[18] *Id.*

[19] *Id.*

[20] *Id.* § 9(2)(a).

§ 5. Eligibility. The commissioner [of OTDA] shall establish standards for determining eligibility for such program, consistent with the following:

1. (a) **A household, regardless of immigration status, shall be eligible for emergency rental assistance**, or both rental assistance and utility assistance. Such household shall be eligible if it:

(i) is a tenant or occupant obligated to pay rent in their primary residence in the state of New York . . . **provided however that occupants of federal or state funded subsidized public housing authorities or other federal or state funded subsidized housing that limits the household's share of the rent to a set percentage of income shall only be eligible to the extent that funds are remaining after serving all other eligible populations;**

(ii) includes an individual who has qualified for unemployment or experienced a reduction in household income, incurred significant costs, or experienced other financial hardship due, directly or indirectly, to the COVID-19 outbreak;

(iii) demonstrates a risk of experiencing homelessness or housing instability; and

(iv) has a household income at or below 80% of the area median income, adjusted for household size.[21]

48.     The provision within the ERAP Law's eligibility criteria regarding public and subsidized housing applicants established that, even if such applicants were otherwise eligible for ERAP assistance and satisfied the prioritization criteria authorized by the Law, they would still be deprioritized from receiving assistance until it had been distributed to all other eligible applicants.

49.     The ERAP Law also established priority in processing applications and allocating funds; at a minimum priority was to be given to households whose income does not exceed 50 percent of the AMI adjusted for household size and households who have one or more individuals who were unemployed as of the date of the application for assistance and were not employed for the 90 days preceding such date.[22]

**Regulatory Frameworks Establishing the Process by Which Public Housing Authorities Must Calculate and Recertify Household Rent**

*Federal Regulatory Framework*

---

[21] *Id.* § 5(1) (emphasis added).

[22] *Id.* § 5(3).

50.     Public housing authorities (PHAs) are authorized to administer public and subsidized housing assistance and are funded in part by the U.S. Department of Housing and Urban Development (HUD).

51.     HUD provides federal funding to PHAs administering the following public and subsidized housing programs: publicly owned and operated housing, authorized under Section 9 of the U.S. Housing Act of 1937 (hereinafter "Section 9 public housing"); the Housing Choice Voucher Program, authorized under Section 8 of the U.S. Housing Act of 1937, as amended, which provides tenant-based assistance (hereinafter "Section 8 tenant-based assistance"); and project-based vouchers, also authorized under Section 8 of the U.S. Housing Act of 1937, as amended, but which are made available to property managers directly (hereinafter "Section 8 project-based assistance").

52.     "Lawful source of income" is a protected category under the New York State Human Rights Law, which was recently added to combat discrimination against New Yorkers who pay for housing using income from PHA assistance, including Section 8.[23]

53.     PHAs are required to determine the portion of rent owed by Section 9 public housing households, as well as households receiving Section 8 tenant-based assistance and Section 8 project-based assistance, in accordance with HUD requirements.[24] This is referred to as the "total tenant payment" for Section 9 public housing households and households receiving Section 8

---

[23] *See* N.Y. Exec. Law § 296(5)(a)(1). New York City has had a similar provision in place since 2008. *See* N.Y.C. Admin. § 8-107(5). These protections were put in place to resolve the historically prevalent practice of income discrimination, which is one of the top housing-related complaints that the New York City Commission on Human Rights receives each year. *See Fighting Source of Income Discrimination*, Mayor's Office of Data Analytics & NYC Commission on Human Rights, https://modaprojects.cityofnewyork.us/fighting-source-of-income-discrimination/ (last visited Apr. 24, 2024); David Branch, *NYC's 'Hollowed Out' Enforcement Units Struggle to Keep Pace on Housing Discrimination Cases*, City Limits (June 1, 2021), https://citylimits.org/2021/06/01/nycs-hollowed-out-enforcement-units-struggle-to-keep-pace-on-housing-discrimination-cases/.

[24] *See generally* 24 C.F.R. §§ 5.601–5.661.

project-based assistance, or "tenant rent" (which equals total tenant payment minus utility allowance) for households receiving Section 8 project-based assistance.[25]

54.     HUD regulation provides different parameters for how PHAs must determine the total tenant payment depending on the subsidization source. The requirements for Section 9 public housing households are codified within 24 C.F.R. part 960;[26] the requirements for households receiving Section 8 tenant-based assistance are codified within 24 C.F.R. part 982;[27] and the requirements for households receiving Section 8 project-based assistance are codified within 24 C.F.R. part 983.[28]

55.     PHAs are required to conduct annual reexaminations of family income and composition for Section 9 public housing households, as well as households receiving Section 8 tenant-based assistance and Section 8 project-based assistance, in accordance with HUD requirements (hereinafter "Annual Recertification").[29] During Annual Recertification, the PHA must make appropriate adjustments in the rent upon verification of the information provided by the household.[30]

---

[25] 24 C.F.R. § 5.603. Total tenant payment generally equals the highest of the following amounts, rounded to the nearest dollar: 30 percent of the family's monthly adjusted income; 10 percent of the family's monthly income; or a minimum rent standard, as determined in accordance with HUD regulation. 24 C.F.R. § 5.628.

[26] Once a year, and in cases of financial hardship, the PHA must give each household the opportunity to choose between two methods for determining the amount of rent payable monthly by the household: "flat rent," or income-based rent. 24 C.F.R. § 960.253(a)(1). "Flat rent" is a fixed amount determined by HUD annually, based on the market rental value of the unit. 24 C.F.R. § 960.253(b). Income-based rent is based on the household's income and the PHA's policies for determination of such rents. 24 C.F.R. § 960.253(c).

[27] The PHA must pay a monthly housing assistance payment on behalf of the family, calculated pursuant to HUD regulation. 24 C.F.R. § 982.505. The owner and the family negotiate a reasonable rent, not more than 40 percent of the family's monthly adjusted income, with support from the PHA at the family's request and ultimate approval by the PHA. 24 C.F.R. §§ 982.506–982.508.

[28] The PHA must pay a monthly housing assistance payment to the owner for a contract unit leased to a family, calculated pursuant to HUD regulation. 24 C.F.R. § 983.351(c).

[29] *See* 24 C.F.R. § 960.257(a)(1); 24 C.F.R. § 982.516(a)(1); 24 C.F.R. § 983.2(c)(6)(ii).

[30] *See* 24 C.F.R. § 960.257(a)(1); 24 C.F.R. § 982.516(a)(1); 24 C.F.R. § 983.2(c)(6)(ii).

56.     PHAs are also required to conduct interim reexaminations of family income or composition because of any changes since the last determination, as requested by Section 9 public housing households, as well as households receiving Section 8 tenant-based assistance and Section 8 project-based assistance (hereinafter "Interim Recertification").[31] The PHA must conduct Interim Recertification within a reasonable period of time — which generally "should not be longer than 30 days after changes in income are reported" — after the request.[32] The PHA must adopt policies consistent with HUD regulation prescribing when and under what conditions the family must report a change in family income or composition.[33]

57.     For Section 9 public housing households, if the household reported a change in family income or composition in a timely manner according to the PHA's policies, any decrease in rent calculated by the PHA "will be effective on the first day of the first month after the date of the actual change" that led the PHA to conduct the Interim Recertification.[34]

58.     For households receiving Section 8 tenant-based assistance and Section 8 project-based assistance, if the household reported a change in family income or composition in a timely manner according to the PHA's policies, any decrease in rent calculated by the PHA "will be effective on the first day of the first month after the date of the reported change" that led the PHA to conduct the Interim Recertification.[35]

*NYCHA Policy for Calculating Rent and Reporting Changes in Household Income*

---

[31] *See* 24 C.F.R. § 960.257(b)(1); 24 CFR § 982.516(c)(1); 24 C.F.R. § 983.2(c)(6)(ii).

[32] 24 C.F.R. § 960.257(b)(1); 24 C.F.R. § 982.516(c)(1); 24 C.F.R. § 983.2(c)(6)(ii).

[33] *See* 24 C.F.R. § 960.257(b)(5); 24 CFR § 982.516(d); 24 C.F.R. § 983.2(c)(6)(ii).

[34] 24 C.F.R. § 960.257(b)(6)(i).

[35] 24 C.F.R. § 982.516(c)(4)(i); 24 C.F.R. § 983.2(c)(6)(ii).

59.     NYCHA is a PHA required to comply with HUD regulation as described in paragraphs 50–58. In Fiscal Year 2023, NYCHA reported receiving $2.81 billion, or 64 percent of its revenue, from HUD to support NYCHA's administration of Section 9 public housing, Section 8 tenant-based assistance, and Section 8 project-based assistance.[36]

60.     For Section 9 public housing, NYCHA calculates rent using the household's income and charges the lesser of the income-based rent or flat rent.[37] The total tenant payment for rent under the income-based rent approach is the highest of either 30 percent of the adjusted monthly gross income (which equals the household's gross income plus the cash value of assets minus any exclusions and allowable deductions) or 10 percent of the family's monthly gross income, rounded to the nearest dollar.[38] If NYCHA finds that the household has no income other than excluded sources, the rent will be set at the minimum rent, zero ($0).[39] For households receiving Section 8 tenant-based assistance, generally families pay no more than 40 percent of their adjusted monthly income toward their rent share and NYCHA pays the remaining amount to the owner on the family's behalf.[40]

61.     NYCHA is required to conduct Annual Recertification pursuant to HUD regulation described above. To fulfill this requirement, NYCHA requires public and subsidized residents to

---

[36] *Report on the Fiscal 2024 Preliminary Plan and the Fiscal 2023 Preliminary Mayor's Management Report for the New York City Housing Authority*, New York City Council, 3–4 (Mar. 13, 2023), https://council.nyc.gov/budget/wp-content/uploads/sites/54/2023/03/NYCHA.pdf.

[37] *See Admissions and Continued Occupancy Policy*, *Chapter 7: Current State Rent Calculation and Verifications & Chapter 8: Reexaminations and Continued Occupancy (in effect until December 1, 2024)*, New York City Housing Authority (last updated Dec. 15, 2023) https://www.nyc.gov/site/nycha/residents/acop/chapter-7and8-current-state-till-120124.page.

[38] *See id.*

[39] *See id.*

[40] *See About Section 8*, New York City Housing Authority, https://www.nyc.gov/site/nycha/section-8/about-section-8.page (last visited Mar. 26, 2024).

submit an Affidavit of Income, in which they supply information on their household composition, income, assets, and expenses, as well as supporting documentation.[41]

62.     NYCHA is required to conduct Interim Recertification pursuant to HUD regulation described above. If a public or subsidized NYCHA household is in between Annual Recertification periods and experiences a change to their household composition, income, or disability status, the household is required to timely notify NYCHA pursuant to HUD regulation as described above. This notice triggers the Interim Recertification process.[42] As part of Interim Recertification, NYCHA requires public and subsidized residents to provide supporting documentation reflecting the change.[43]

63.     Once NYCHA has reviewed and verified the information submitted by a NYCHA resident as part of an Annual or Interim Recertification, NYCHA is required to recalculate and adjust as necessary the amount a family is expected to contribute for rent pursuant to HUD regulation described above. NYCHA policy requires its staff to complete processing Interim

---

[41] *See Admissions and Continued Occupancy Policy*, *Chapter 7: Current State Rent Calculation and Verifications & Chapter 8: Reexaminations and Continued Occupancy (in effect until December 1, 2024)*, New York City Housing Authority (last updated Dec. 15, 2023), https://www.nyc.gov/site/nycha/residents/acop/chapter-7and8-current-state-till-120124.page; *Housing Choice Voucher Program Administrative Plan*, New York City Housing Authority, 46–47 (Oct. 1, 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/hcpvadministrative.pdf.

[42] *See Admissions and Continued Occupancy Policy*, *Chapter 7: Current State Rent Calculation and Verifications & Chapter 8: Reexaminations and Continued Occupancy (in effect until December 1, 2024)*, New York City Housing Authority (last updated Dec. 15, 2023), https://www.nyc.gov/site/nycha/residents/acop/chapter-7and8-current-state-till-120124.page (outlining policy for Section 9 public housing households) ("[Households] must indicate the following information and provide their supporting documentation in order to submit the [Interim Recertification] request: Type of change; Reason for the change; Household member who experienced the change; and Date of the change."); *Housing Choice Voucher Program Administrative Plan*, New York City Housing Authority, 48 (Oct. 1, 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/hcpvadministrative.pdf (outlining policy for households receiving Section 8 tenant-based assistance) ("NYCHA will initiate an interim recertification upon receipt of a complete electronic or written notification of a change in household income or household composition, or when NYCHA otherwise deems it appropriate.").

[43] *Id.*

Recertifications for Section 9 public housing households within 60 calendar days of the date that all information or documentation is received.[44]

**Statistical Background on Populations at Risk During the COVID-19 Pandemic**

*Demographics of Public and Subsidized Housing Renters in New York City*

64.     Housing cost burdens facing New Yorkers are currently among the most severe in the nation, with one in five households experiencing a severe cost burden — meaning more than 50 percent of income is for housing costs. Low-income renters are the most cost-burdened.[45] Housing cost burdens are highest in New York City, representing about half of all renter households.[46]

65.     New York City contains approximately 2,271,037 renter-occupied housing units.[47] Of these rental units, an estimated 780,854 units (34.4 percent) house White tenants; an estimated 529,404 units (23.3 percent) house Black tenants; and an estimated 731,050 units (32.2 percent) house Hispanic or Latino tenants.[48] Taken together, in New York City, Black and Hispanic or Latino renters occupy 55.5 percent of all renter-occupied units, while White renters occupy 34.4 percent of renter-occupied units.

---

[44] *See Admissions and Continued Occupancy Policy*, *Chapter 7: Current State Rent Calculation and Verifications & Chapter 8: Reexaminations and Continued Occupancy (in effect until December 1, 2024)*, New York City Housing Authority (last updated Dec. 15, 2023), https://www.nyc.gov/site/nycha/residents/acop/chapter-7and8-current-state-till-120124.page.

[45] *New Yorkers in Need: The Housing Insecurity Crisis*, New York State Comptroller, 6, 11–12 (Feb. 2024), https://www.osc.ny.gov/files/reports/pdf/new-york-housing-insecurity.pdf.

[46] *Id.* at 9.

[47] *Demographic Characteristics for Occupied Housing Units, American Community Survey, ACS 1-Year Estimates Subject Tables,* Table S2502, U.S. Census Bureau (2022), https://data.census.gov/table/ACSST1Y2022.S2502?q=race+of+housing+renters+in+new+york+city. For comparison, New York State contains 3,569,971 renter-occupied housing units. Of these rental units, an estimated 1,632,886 units (45.7 percent) house White tenants; an estimated 716,090 units (20.1 percent) house Black tenants; and an estimated 926,436 units (26.0 percent) house Hispanic or Latino tenants. Taken together, Black and Hispanic or Latino renters make up 46.1 percent of all statewide renter-occupied housing units, compared with White renters, who make up 45.7 percent of renter-occupied units. *Id.*

[48] *Id.*

66.     Across New York City, Black and Hispanic or Latino tenants make up 84 percent of households subsidized by HUD, compared with just 10 percent of White tenants.[49] The following chart outlines the breakdowns by each subsidization category:

| Subsidization Type | Demographic % of NYS HUD-Subsidized Households | | |
|---|---|---|---|
| | Non-Hispanic Black | Hispanic | Non-Hispanic White |
| Section 9 Public Housing | 42 | 47 | 4 |
| Section 8 Tenant-Based Assistance | 36 | 47 | 14 |
| Section 8 Project-Based Assistance | 28 | 48 | 12 |
| **All HUD Programs** | 37 | 47 | 10 |

67.     As of April 2023, NYCHA is the largest PHA in the country, and provides public and subsidized housing to 528,105 total authorized New York City residents.[50] This breaks out into 360,970 residents in 177,569 apartments across 335 Section 9 public housing developments managed by NYCHA (approximately two thirds of all NYCHA Residents), and 167,135 residents who receive rental subsidies from NYCHA through HUD's Section 8 programs (approximately one third of all NYCHA Residents).

68.     Public Housing operated by NYCHA makes up almost 8 percent of the New York City rental market.[51] Black and Hispanic tenants make up approximately 89 percent of all NYCHA public housing residents, while White tenants account for less than 4 percent.[52]

---

[49] *Assisted Housing: National and Local Dataset*, U.S. Department of Housing and Urban Development (2023), https://www.huduser.gov/portal/datasets/assthsg.html. For comparison, across New York State, Black and Hispanic or Latino tenants make up 72 percent of households subsidized by HUD, compared with just 22 percent of White tenants. *Id.*

[50] *NYCHA 2023 Fact Sheet*, New York City Housing Authority, 1 (Apr. 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/NYCHA-Fact-Sheet-2023.pdf.

[51] *The 2023 New York City Housing and Vacancy Survey: Selected Initial Findings*, New York City Department of Housing Preservation and Development, 88, fig. C1 (2024), https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf.

[52] *2023 Resident Data Book Summary*, New York City Housing Authority, 2 (Feb. 2023), https://www.nyc.gov/assets/nycha/downloads/pdf/Resident-Data-Book-Summary-2023.pdf (indicating Black residents make up 43.70 percent of the NYCHA population and Hispanic residents make up 45.37 percent of the NYCHA population, totaling a combined 89.07 percent of the NYCHA population).

69.     Black and Hispanic or Latino renters in New York City therefore make up 55 percent of the market-rate tenant population compared to 89 percent of the NYCHA public housing population, while White renters in New York City make up 34 percent of the market-rate tenant population compared with 4 percent of the NYCHA public housing population.

70.     A significantly higher percentage of Black and Hispanic or Latino renters are public or subsidized NYCHA residents compared to White renters.

*Impacts of the COVID-19 Pandemic on Black and Hispanic or Latino New Yorkers*

71.     By summer of 2020, nearly half of all New York City workers and more than half of low-wage workers, who are predominantly Black and Hispanic, lost employment income during the height of the COVID-19 pandemic.[53]

72.     Black, multiracial, and Hispanic workers were the demographic groups most affected by wage loss over the pandemic period.[54]

73.     Black and Latino adults were more likely than White adults to report experiencing the death of someone close to them since January 2020 and being financially stressed due to the impacts of the pandemic.[55] Those who reported experiencing the death of someone close to them since January 2020 or above average financial stress during the pandemic were more likely to also report symptoms of anxiety or depression.[56]

---

[53] *Nearly Half of New York City Workers Lost Employment Income Due to the Pandemic,* Columbia University Center on Poverty & Social Policy: Poverty Tracker (Nov. 12, 2020), https://www.povertycenter.columbia.edu/news-internal/2020/covid-lost-income-new-yorkers.

[54] *Analysis of COVID-19 and Wage Loss,* New York City Mayor's Office for Economic Opportunity: Workforce Data Portal (last updated Apr. 7, 2022), https://workforcedata.nyc.gov/en/data-stories/wage-impact-covid-19.

[55] *Impacts of COVID-19 on Mental Health in New York City*, New York City Department of Health, 2 (Dec. 2021), https://www.nyc.gov/assets/doh/downloads/pdf/epi/databrief130.pdf.

[56] *Id.*

74.     During this timeframe, NYCHA's response time for service requests declined,[57] impacting residents' quality of life.[58] The average time it took NYCHA to resolve emergency service requests rose consistently from 12.7 hours in 2019 to 27.8 hours in 2023, and non-emergency service requests from 19.4 days in 2019 to 65.4 days in 2023.[59]

75.     NYCHA acknowledged that the COVID-19 pandemic "hit NYCHA residents particularly hard."[60] As of June 2023, more than 68,000 households were in rental arrears, compared to fewer than 55,000 in 2019.[61] By November 2023, this estimate had risen to 73,000 households.[62]

76.     Overdue rents for NYCHA residents totaled $466 million by the end of 2022, with more than $400 million having accrued during the pandemic.[63] One year later, by November 2023, this estimate had risen to $533 million.[64]

---

[57] *Mayor's Management Report*, City of New York, 382 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

[58] Mihir Zaveri, *As Thousands Fall Behind on Rent, Public Housing Faces 'Disaster'*, N.Y. Times (Jan. 23, 2023), https://www.nytimes.com/2023/01/23/nyregion/rent-crisis-public-housing.html.

[59] *Mayor's Management Report*, City of New York, 382 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

[60] *Id.* at 379.

[61] *Id.*

[62] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha.

[63] Iziah Thompson, *Forgotten: Rent Arrears in New York Public Housing Over the COVID-19 Pandemic*, Community Service Society, 1 (Mar. 2023), https://smhttp-ssl-58547.nexcesscdn.net/nycss/images/uploads/pubs/NYCHA_Arrears_V4.pdf.

[64] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha.

77.     Apartment vacancies also increased during this timeframe as NYCHA residents moved out. NYCHA reported that the number of vacant apartments rose from fewer than 500 in November 2021 to 3,300 in December 2022,[65] and is currently more than 4,900 as of March 2024.[66]

**Defendants' Harmful Conduct During and Following the COVID-19 Pandemic**

*NYCHA Recertification Policy During the COVID-19 Pandemic*

78.     In response to the pandemic, HUD released a memorandum on procedure for Annual and Interim Recertification protocol during COVID-19, which directed owners to "continue to perform annual and interim recertifications, as requested by tenants, within the required timeframes and using current/anticipated data."[67]

79.     During the pandemic, NYCHA directed residents to report a rent hardship due to decrease in household income as soon as possible by completing an Interim Recertification via its Self-Service Portal or paper application, stating that "[t]he standard two-month waiting period that is normally required to apply for an Interim Recertification has been suspended."[68]

80.     NYCHA committed to continuing to review both Interim and Annual Certifications, and stated that both the public and subsidized recertification process would continue normally.[69]

---

[65] *Vacancies in NYCHA Properties,* New York City Council (Jan. 31, 2023), https://council.nyc.gov/data/nycha-vacancy/.

[66] *NYCHA Metrics: Occupied and Vacant Apartments*, New York City Housing Authority, https://eapps.nycha.info/NychaMetrics/ (last visited Mar. 7, 2024).

[67] Tobias J. Halliday, *Memorandum on Annual and Interim Recertification Protocol During COVID-19*, U.S. Department of Housing and Urban Development, 1 (Apr. 9, 2020), https://www.pmcsinc.com/pdf/Recertification_Protocol_COVID-19_4-9-2020.pdf.

[68] *COVID-19 FAQ,* New York City Housing Authority (last updated Feb. 3, 2022), https://www.nyc.gov/site/nycha/about/covid-19-FAQ.page.

[69] *See id.*

81.    On the COVID-19 FAQ page of its website, last updated in February 2022, NYCHA stated that it would recalculate rent to as low as zero based on pandemic-related changes in income:

> When NYCHA residents lose full or partial income, or receive unemployment benefits, due to COVID-19 or any other circumstance, their rent will decrease and will still always be 30 percent of their household income. This means that if the household income is zero, we can reduce the rent to zero.[70]

82.    Regarding subsidized Section 8 residents, the COVID-19 FAQ page of NYCHA's website further stated that "NYCHA staff will prioritize Interim Recertifications for reduced incomes."[71]

83.    Between March 2020 and February 2022, 59,811 NYCHA households submitted recertification requests to decrease their monthly rent payment due to a reduction of income or a complete loss of income.[72] This represented an increase of 56,205 applications, compared to the number of Interim Recertification requests submitted in 2019, before the COVID-19 pandemic.[73] There is no public information available indicating how many, if any, of these applications were timely completed by NYCHA. Upon information and belief, many of these households were not properly recertified, including two of the named Plaintiffs.

84.    From 2019 through 2021, NYCHA received more than 500,000 requests for rent adjustments.[74] There is no public information available indicating how many, if any, of these

---

[70] *Id.*

[71] *Id.*

[72] *Report on the Fiscal 2023 Preliminary Plan and the Fiscal 2022 Preliminary Mayor's Management Report for the New York City Housing Authority*, New York City Council, 5 (Mar. 8, 2022), https://council.nyc.gov/budget/wp-content/uploads/sites/54/2022/03/NYCHA.pdf.

[73] *Id.*

[74] Mihir Zaveri, *As Thousands Fall Behind on Rent, Public Housing Faces 'Disaster'*, N.Y. Times (Jan. 23, 2023), https://www.nytimes.com/2023/01/23/nyregion/rent-crisis-public-housing.html.

requests were timely processed by NYCHA. Upon information and belief, many of these households were not timely processed.

85.     Failure to consider a household's loss of income through timely processing of an Annual or Interim Recertification would impact the amount NYCHA charged for rent and could allow NYCHA to improperly calculate a payment equaling more than what is permitted by law.

86.     NYCHA's consistent failure to recertify households during the pandemic contributed to NYCHA residents' financial burdens and emotional distress. This disproportionately impacted Black and Hispanic or Latino who make up the vast majority of NYCHA residents.

*OTDA's Administration of ERAP*

87.     OTDA reviews and processes eligible ERAP applications submitted through an application portal, at https://nysrenthelp.otda.ny.gov/ (the "ERAP Application Portal") as well as a subpage of its website for information about the program, at https://otda.ny.gov/programs/emergency-rental-assistance/ (the "OTDA Website").

88.     On June 1, 2021, the ERAP Application Portal opened at 9:00 AM. The OTDA Website informed applicants that they had to meet the following criteria to be eligible: (1) household income is at or below 80 percent of the Area Median Income (AMI) based on current income of calendar year 2020 income; (2) on or after March 13, 2020, a member of the household received unemployment benefits or experienced a reduction in income, incurred significant costs, or experienced financial hardship due to the COVID-19 pandemic; (3) the applicant was obligated to pay rent at their primary residence and has rent arrears at their current resident for rent owed on

or after March 13, 2020; (4) the household must be at risk of experiencing homelessness or housing instability, which can be demonstrated by having rental arrears owed on or after March 13, 2020.[75]

89.     The ERAP Website also provided information regarding priority applications. The notice published on the Website stated that for the first 30 days of the program, priority would be given in the following order: (1) households with income at or below 50 percent of the AMI that also include a household member who is currently unemployed for at least 90 days; or is a veteran; or is currently experiencing domestic violence or a survivor of human trafficking; or has an eviction case related to their current residence pending in court; or resides in a mobile home; or lives in a community that was disproportionately impacted by COVID-19 (according to ZIP code); or lives in a dwelling of 20 or fewer units; (2) households with an income at or below 50 percent AMI; (3) households with income at or below 80 percent AMI that also include a household member who is currently unemployed for at least 90 days; or is a veteran; or is currently experiencing domestic violence or a survivor of human trafficking; or has an eviction case related to their current residence pending in court; or resides in a mobile home; or lives in a community that was disproportionately impacted by COVID-19 (according to ZIP code); or lives in a dwelling of 20 or fewer units; (4) households with income at or below 80 percent AMI.[76]

90.     The notice published on the OTDA Website stated that "after the first 30 days, eligible applications would be processed on a first-come, first-served basis, as long as funds remained available."[77] At this time the OTDA Website did not make any reference to the statutory deprioritization of public and subsidized housing tenants.

---

[75] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (June 1, 2021), https://web.archive.org/web/20210601093817/https://otda.ny.gov/programs/emergency-rental-assistance/.

[76] *Id.*

[77] *Id.*

91.     By September 15, 2021, the notice published on the OTDA Website was updated to state that "applications for a new, state-funded program for households with income between 80 and 120 percent AMI" would be accepted through the ERAP application portal.[78] Public and subsidized housing tenants remained ineligible regardless of their household income.

92.     Between October 13 and 19, 2021, the notice published on the OTDA Website was updated to inform applicants that federal funding provided to the State was almost fully committed to eligible applicants.[79] The update further stated that while OTDA was still accepting applications, funding was not likely to be available except to a list of specified groups, none of which included subsidized tenants.[80]

93.     By November 12, 2021, the notice published on the OTDA Website was updated to inform applicants that total requests for assistance exceeded available federal funding.[81] The update stated that as of November 14, 2021, the Portal would be closed, other than for the following categories of applications: (1) tenants in Dutchess County, Nassau County (not including the towns of Hempstead or Oyster Bay), Niagara County, Oneida County, Saratoga County, Suffolk County (not including the towns of Brookhaven or Islip), Westchester County (not including the city of Yonkers) where allocations had not yet been exhausted and (2) households in any part of the state with income over 80 percent and up to 120 percent of AMI could still apply for state-funded

---

[78] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Sept. 15, 2021), https://web.archive.org/web/20210915003846/https://otda.ny.gov/programs/emergency-rental-assistance/.

[79] *Compare Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Oct. 13, 2021), https://web.archive.org/web/20211013071752/https://otda.ny.gov/programs/Emergency-Rental-Assistance/, *with Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Oct. 19, 2021), https://web.archive.org/web/20211019023231/https://otda.ny.gov/programs/emergency-rental-assistance/.

[80] *Id.*

[81] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Nov. 12, 2021), https://web.archive.org/web/20211112233558/https://otda.ny.gov/programs/emergency-rental-assistance/.

emergency rental assistance.[82] All but one of these counties have majority white renter populations.[83]

94.     On January 6, 2022, OTDA was ordered by a judge to reopen the ERAP Application Portal after the court granted a request for a preliminary injunction that had been filed by the Legal Aid Society.[84]

95.     By January 11, 2022, the notice published on the OTDA Website was updated to state that while OTDA would begin accepting new ERAP applications due to the court order, at that time there was no federal funding available to provide assistance in most areas of the State.[85] However, OTDA continued to encourage applications from the list of counties where funding was still available, and noted that households in any part of the state with income over 80 percent and up to 120 percent of AMI could still apply for state-funded emergency rental assistance.[86]

96.     Between February 10 and 14, 2022, the notice published on the OTDA Website was updated to include for the first time a notice of the deprioritization of public and subsidized housing tenants.[87] Specifically, the OTDA Website informed applicants of the following:

---

[82] *Id.*

[83] White individuals comprise 62.9% of the Duchess County population in renter occupied units, 64.9% in Nassau County (excluding Hempstead and Oyster Bay), 74.8% in Niagara County, 75.1% in Oneida County, 88.1% in Saratoga County, 57.9% in Suffolk County (excluding Brookhaven and Islip) and 38.5% in Westchester County (excluding Yonkers). *Demographic Characteristics for Occupied Housing Units, American Community Survey, ACS 1-Year Estimates Subject Tables,* Table S2502, U.S. Census Bureau (2022), https://data.census.gov/table/ACSST1Y2022.S2502?q=race%20of%20housing%20renters%20in%20new%20york.

[84] Press Release, *Court Ruling Secured by Legal Aid Protected 136,607 Households from Eviction, Helped Tens of Thousands of Families Qualify for Millions in Emergency Rental Assistance Program Funding*, The Legal Aid Society (Dec. 14, 2022), https://legalaidnyc.org/wp-content/uploads/2022/12/Court-Ruling-Secured-by-Legal-Aid-Protected-136607-Households-from-Eviction-Helped-Tens-of-Thousands-of-Families-Qualify-for-Millions-in-Emergency-Rental-Assistance-Program-Funding.pdf.

[85] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Jan. 11, 2022), https://web.archive.org/web/20220111204611/https://otda.ny.gov/programs/emergency-rental-assistance/.

[86] *Id.*

[87] *Compare Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Feb. 9, 2022), https://web.archive.org/web/20220209065152/https://otda.ny.gov/programs/emergency-

Applicants from subsidized housing tenants whose rent is limited to a certain percentage of income (including public housing and section 8) are not currently able to be paid. The State Law requires that these applicants are only paid after all other eligible applicants have been paid. At this time, none of the subsidized housing applications can be paid regardless of the date their application was submitted.[88]

97.     By May 4, 2022, the notice published on the OTDA Website was updated to include FHEPS recipients within the list of applicants not to be paid.[89] The notice also added the following sentence: "Residents of public housing are urged to contact their public housing authority to determine if their rent can be adjusted retroactively based on a previous change in circumstances, including a reduction in income."[90]

98.     By January 12, 2023, the notice published on the OTDA Website was updated to add that the ERAP Application Portal would close on January 20, 2023.[91] The update stated that applications submitted before this deadline would "continue to be processed in the order received, consistent with State law and program rules."[92]

99.     On or about May 18, 2023, the notice published on the OTDA Website was updated to state that applications submitted before the portal closed on January 20, 2023 were being

---

rental-assistance/, *with Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Feb. 14, 2022), https://web.archive.org/web/20220214192529/https://otda.ny.gov/programs/emergency-rental-assistance/.

[88] *Id.* Some version of this notice of deprioritization was present on the OTDA Website until at least May 1, 2023.

[89] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (May 4, 2022), https://web.archive.org/web/20220504173836/https://otda.ny.gov/programs/emergency-rental-assistance/.

[90] *Id.*

[91] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (Jan. 12, 2023), https://web.archive.org/web/20230112145055/https://otda.ny.gov/programs/emergency-rental-assistance/.

[92] *Id.*

reviewed and processed in the order received.[93] Specifically, the updated notice informed applicants of the following:

> Applications submitted before the application portal closed on January 20, 2023, including applications from subsidized housing tenants whose rent is limited to a certain percentage of income (including public housing, section 8 and FHEPS), are being reviewed and processed in the order received, consistent with State law and program rules.[94]

100.    The ERAP deprioritization represented a deviation from other programs administered by OTDA, including the Supplemental Nutrition Assistance Program (SNAP), which sets the criteria for eligibility and benefit levels based on household size and income, but does not discriminate against public and subsidized housing residents,[95] as well as the Temporary Assistance programs, which take applicants' sources of income into account to calculate their total benefit package, but do not use their status as public and subsidized housing residents as criteria to prevent them from accessing the assistance entirely.[96]

101.    Additionally, unlike OTDA, several localities throughout the United States chose to prioritize subsidized tenants by using nondiscriminatory factors to target those who were at greatest financial and health risk during the pandemic.[97]

---

[93] *Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance (May 18, 2023), https://web.archive.org/web/20230518094032/https://otda.ny.gov/programs/emergency-rental-assistance/.

[94] *Id.* This language remains on the OTDA Website as of April 2024. *See Emergency Rental Assistance Program (ERAP)*, New York State Office of Temporary and Disability Assistance, https://otda.ny.gov/programs/emergency-rental-assistance (last visited Apr. 5, 2024).

[95] *Supplemental Nutrition Assistance Program (SNAP)*, New York State Office of Temporary and Disability Assistance, https://otda.ny.gov/programs/snap/#eligibility (last visited Apr. 24, 2024).

[96] *Temporary Assistance (TA)*, New York State Office of Temporary and Disability Assistance, https://otda.ny.gov/programs/temporary-assistance/#eligibility (last visited Apr. 24, 2024).

[97] *See* Rebecca Yae et al., *Prioritization In Emergency Rental Assistance Programs: A Framework of Strategies, Policies, And Procedures To Better Serve Priority Populations*, National Low Income Housing Coalition & The Center for Law and Social Policy, 6–9 (Apr. 2021), http://www.clasp.org/wp-content/uploads/2021/04/Prioritization-in-Emergency-Rental-Assistance-Programs_x.pdf.

102.    For instance, San Diego County prioritized renters with low incomes who lived in areas that experienced health inequities. Oregon Housing and Community Services prioritized those with highest risk of housing instability, along with months delinquent, household size, and households displaced in the 2020 Oregon wildfires.[98]

103.    Other programs specifically targeted populations that have historically been disadvantaged, and who faced disproportionate impacts from the pandemic by distributing a certain percentage of funding to households and communities of color.[99]

104.    In doing so, these localities implemented their ERA programs in a manner consistent with the Treasury's direction to prioritize those with 50 percent AMI or less, including those in subsidized housing, without running afoul of Civil Rights Law.[100]

105.    Despite knowing NYCHA residents face heightened risks, OTDA's discriminatory implementation of ERAP left them waiting years for critical assistance or prevented them from benefiting at all.

_NYCHA's Role in Applying for and Implementing ERAP on Behalf of Residents_

106.    As part of the ERAP application, OTDA required the property owner, landlord, or management company to submit proof of ownership to support an applicant's ERAP

---

[98] _Id._ at 6.

[99] _Id._ at 7–8.

[100] _Emergency Rental Assistance Program: FAQs_, U.S. Department of the Treasury (last updated July 6, 2022), https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/emergency-rental-assistance-program/faqs.

application.[101] Without the landlord's submission of the required materials, a tenant's application would be considered incomplete.[102]

107.    At some point after the ERAP application portal opened, OTDA partnered with NYCHA to collaborate on a process to facilitate NYCHA residents' applications.[103]

108.    As part of this process, tenants were required to submit information to NYCHA, and NYCHA was required to submit information to OTDA as part of public and subsidized NYCHA residents' ERAP applications.[104] Without NYCHA's submission of the required materials, public and subsidized NYCHA residents' ERAP applications would be considered incomplete.[105]

109.    From June 1, 2021, through at least October 30, 2021, NYCHA failed to update the COVID-19 FAQ page of its website to include any information about applying for ERAP.[106]

---

[101] *ERAP Frequently Asked Questions: Application Processing*, New York State Office of Temporary and Disability Assistance, https://otda.ny.gov/programs/emergency-rental-assistance/faq.asp#faq-application (last visited Apr. 24, 2024) ("7. Are tenants supposed to gather documents from landlords? No. Once a tenant provides their landlord's contact information, the landlord will receive an invitation by email, postal mail or text to complete their portion of the application.").

[102] *Id.* ("6. If a landlord does not respond, can the rental payments be made to tenants? No. . . . Program administrators will contact landlords to inform them that additional information is needed based on the email or other contact information provided by the tenant.").

[103] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha ("The state legislation authorizing ERAP required that tenants of subsidized housing could not be paid until all other applications had been considered. . . . In an effort to connect as many households as possible to ERAP funds, OTDA partnered with NYCHA to establish a process that provided up to 12 months of financial relief to households that accumulated rent arrears at the height of the pandemic.")

[104] *Quick Reference Guide on Applying for Emergency Rental Assistance*, New York City Housing Authority 1 (Sept. 2021), https://www.nyc.gov/assets/nycha/downloads/pdf/ERAP-Quick_Reference_Guide-Sep-2021.pdf.

[105] *Id.* at 4.

[106] *COVID-19 FAQ,* New York City Housing Authority (Oct. 30, 2021), https://web.archive.org/web/20211223181907/https://www1.nyc.gov/site/nycha/about/covid-19-FAQ.page. The archived page, captured on October 30, 2021, states that the website had last been updated on December 29, 2020.

NYCHA, which had the best ability to contact its low income residents, failed to provide this crucial information despite ongoing issues with outreach and awareness of ERAP.[107]

110.    By December 23, 2021, NYCHA had finally updated the COVID-19 FAQ page of its website to include information about applying for ERAP.[108] On the updated version of its COVID-19 FAQ page, NYCHA included the following information:

Q. Are there rent hardship programs NYCHA residents can apply for?

A. NYCHA residents may apply for New York State's Emergency Rental Assistance Program (ERAP), which provides New Yorkers who are behind in rent and have suffered financial hardships due to the COVID-19 pandemic with rental assistance. Eligible New Yorkers can apply for payments for up to 12 months of unpaid rent accrued on or after March 13, 2020. The State will make the final determination as to whether residents are eligible for ERAP once an application has been submitted to the State. Funds are limited and subject to program eligibility, so residents should act soon.

New NYCHA applicants may apply by logging on to the Self-Service Portal to fill out a simple consent form that allows NYCHA to apply for ERAP on their behalf.

NYCHA residents who have already submitted an ERAP application should send their ERAP application number, along with their first and last name, date of birth, development name, and their nine-digit account number, to erap.fin@nycha.nyc.gov so NYCHA can complete the application with the State.

The State will make the final determination as to whether a resident is eligible for ERAP after the application has been submitted. If approved, the funds will go directly to NYCHA and will be reflected in the resident's rent bill.[109]

---

[107]    During the ERAP program rollout, tenant advocates and housing lawyers expressed concerns over awareness of the ERAP program, and said that "many may not even know the aid exists." Mihir Zaveri, *New York Has $2.7 Billion for Rent Relief. Many Have Yet to Receive Aid.*, N.Y. Times (Nov. 12, 2021), https://www.nytimes.com/2021/07/25/nyregion/new-york-city-rent-relief.html. The Governor herself acknowledged the failures in outreach efforts to at risk populations. *See* Anthony Reyes, *What is New York's Emergency Rental Assistance Program?*, WKBW Buffalo (Aug. 30, 2021), https://www.wkbw.com/rebound/what-is-new-yorks-emergency-rental-assistance-program.

[108]    *See COVID-19 FAQ*, New York City Housing Authority (Dec. 23, 2021), https://web.archive.org/web/20211223181907/https://www1.nyc.gov/site/nycha/about/covid-19-FAQ.page. The archived page, captured on December 23, 2021, states that the website had last been updated on October 19, 2021, despite an archived capture from October 31, 2021, *supra*, indicating otherwise.

[109] *Id.* This language also remains on the current version of the website. *See COVID-19 FAQ*, New York City Housing Authority (last updated Feb. 3, 2022), https://www1.nyc.gov/site/nycha/about/covid-19-FAQ.page.

111.    After the ERAP Application Portal closed, NYCHA reported submitting application materials on behalf of 35,389 households, seeking relief totaling more than $128 million.[110]

*Aftermath and Subsequent Proceedings Brought by NYCHA*

112.    In July 2023, the New York State Comptroller released a report acknowledging the deprioritization of public and subsidized housing applicants and stated that as of May 2023, rental households in NYCHA apartments had not received any funding from ERAP.[111] According to the report, City ZIP codes with NYCHA housing represented 78.9 percent of all of the State's unpaid ERAP applications at that time.[112]

113.    Once assistance had already been distributed to non-subsidized applicants, more than two years after the ERAP Application portal opened, the "city-state collaboration" ultimately resulted in assistance distributed to less than half of those applications — and only about one in five of all the households facing rental arrears.[113]

114.    Combined, Defendants' practices and policies have foreseeably caused Plaintiffs and those similarly situated to fall behind on rent, leading to years of emotional distress whether or not they ultimately received assistance.

---

[110]    *Mayor's Management Report*, City of New York, 379 (Sept. 2023), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2023/2023_mmr.pdf.

[111] *See* Press Release, *DiNapoli: Emergency Rental Assistance Program Rebounds After Slow Start*, Office of the New York State Comptroller (July 24, 2023), https://www.osc.ny.gov/press/releases/2023/07/dinapoli-emergency-rental-assistance-program-rebounds-after-slow-start.

[112] *Id.*

[113] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha.

115.   In or about August 2023, NYCHA began to file for evictions against current residents that owe the highest dollar amounts in miscalculated rent, and did not apply for ERAP.[114]

116.   NYCHA has also subsequently initiated a series of consumer debt actions against former NYCHA residents for unpaid, though miscalculated rent. Currently, there are at least 65 consumer debt claims by NYCHA on file in the New York State Supreme Court against former residents, as well as hundreds of civil actions on file in the New York County Civil Court in which NYCHA may be seeking rental arrears.[115]

## The Disproportionate Harm to and Exclusion of Black and Hispanic or Latino Families by Defendants' Actions

117.   Defendants' individual and collective implementation of ERAP had a disparate impact on Black and Hispanic or Latino NYCHA residents. Defendants' explicit deprioritization of public and subsidized housing tenants disproportionately prevented Black and Hispanic or Latino applicants from receiving this critical assistance due to their housing status and source of income, as compared to White applicants.

118.   Defendant NYCHA's individual practices also had a disparate impact on Black and Hispanic or Latino NYCHA households. NYCHA's failure to recertify incomes of those

---

[114] Greg B. Smith, *NYCHA Sends Eviction Notices to Tenants Who Stopped Paying Rent*, THE CITY (Aug. 8, 2023), https://www.thecity.nyc/2023/08/08/nycha-eviction-notices-stopped-paying-rent/. Surveys have identified that eviction, as well as job loss and hazardous housing conditions, can trigger homelessness, which has led to a record-high homeless population in the New York City shelter system. *See Basic Facts About Homelessness: New York City*, Coalition for the Homeless, https://www.coalitionforthehomeless.org/basic-facts-about-homelessness-new-york-city/ (last visited Apr. 24, 2024).

[115] *Case Search Results*, New York State Unified Courts System: New York State Courts Electronic Filing (NYSCEF), https://iapps.courts.state.ny.us/nyscef/CaseSearch (last visited Apr. 11, 2024). For the full list of cases and index numbers, see Exhibit A. NYCHA has also filed hundreds of civil actions against individuals in New York County Civil Court since 2022, of which at least one is to recover rental arrears accrued during or after March 2020. *WebCivil Local Case Search Results*, New York State Unified Courts System: eCourts, https://iapps.courts.state.ny.us/webcivilLocal/LCSearch (last visited Apr. 11, 2024). For the full list of cases and index numbers, see Exhibit B. Because filing documents are not made available online, it is not clear how many of these cases involve rental arrears accrued during or after March 2020.

experiencing hardship during the pandemic allowed it to disproportionately miscalculate the monthly rent owed by Black and Hispanic or Latino residents, as compared to White residents.

119.    As a result, NYCHA residents collectively owe hundreds of millions of dollars in back rent. As of November 2023, the City has stated that 73,000 NYCHA households faced $533 million in rental arrears.[116] Only about half of those households applied for ERAP.

120.    NYCHA residents have reported feeling emotional distress in the face of accruing rental arrears due to their deprioritization from receiving ERAP assistance.[117]

121.    NYCHA has acknowledged that as its residents' arrears accumulated — without support from ERAP — they have become overwhelmed by the debt, "finding the idea of paying off what they owe increasingly daunting."[118]

122.    Black and Hispanic or Latino tenants make up the vast majority of NYCHA residents. These tenants living in public or subsidized housing were far less likely to receive ERAP payments in comparison to renters living in market rate apartments.

123.    Data illustrates the trend that geographic areas with a higher proportion of subsidized tenants have received lower per capita ERAP payments.

---

[116] Press Release, *Mayor Adams, Governor Hochul Announce Initial $95 Million in Emergency Rental Assistance for NYCHA Residents,* City of New York (Nov. 20, 2023), https://www.nyc.gov/office-of-the-mayor/news/882-23/mayor-adams-governor-hochul-initial-95-million-emergency-rental-assistance-nycha.

[117] Mihir Zaveri, *'I'm Scared': Thousands in New York Public Housing Are Behind on Rent,* N.Y. Times (Feb. 8, 2022), https://www.nytimes.com/2022/02/08/nyregion/nycha-evictions-tenants.html; Mihir Zaveri, *As Thousands Fall Behind on Rent, Public Housing Faces 'Disaster'*, N.Y. Times (Jan. 23, 2023), https://www.nytimes.com/2023/01/23/nyregion/rent-crisis-public-housing.html ("[F]or tens of thousands of NYCHA residents who are already dealing with the effects of deteriorating buildings, owed back rent is now a new source of constant anxiety.").

[118] Greg B. Smith, *NYCHA Rent Bailout Proposed for State Budget, with $466 Million Owed*, THE CITY (Mar. 23, 2023), https://www.thecity.nyc/2023/03/13/nycha-rent-bailout-erap-new-york/.

124.    Based on this analysis, OTDA's deprioritization policy, targeting and categorically excluding public and subsidized housing residents from receiving ERAP assistance, has had a disproportionate impact on Black and Hispanic or Latino persons.

### Individual Plaintiffs' Facts

*Wanda Baez*

125.    Plaintiff Wanda Baez currently resides at 120 Bellamy Loop, #13D, Bronx, New York 10475. Ms. Baez is a woman of Latina descent.

126.    From 1995 to 2022, Ms. Baez resided in the Throggs Neck Houses, a NYCHA development, at 2773 Dewey Avenue, Apt #1A, Bronx, New York. From 1995 to 2003, Ms. Baez lived with her son. From 2003 to 2022, Ms. Baez lived alone. Ms. Baez worked as a teacher, only earning a living 10 months out of the year.

127.    In 2020, Ms. Baez was employed as a teacher at the New York City Children Center (NYCCC) in the Bronx. NYCCC ceased operations during the COVID-19 pandemic, leaving Ms. Baez without a consistent source of income.

128.    Soon thereafter, Ms. Baez experienced a long and extended period of illness, necessitating frequent hospital visits and extended absences from work due to health-related issues. Around this time, Ms. Baez's sister died after complications from COVID-19.

129.    Ms. Baez's illness continued into 2021. NYCCC denied her paid sick leave. Ms. Baez's various hospital trips, in addition to financial difficulties, exacerbated by the COVID-19 pandemic, prevented Ms. Baez from paying her rent.

130.    On August 9, 2021, Ms. Baez applied for ERAP. Ms. Baez had anticipated that the ERAP assistance would cover her rental arrears accrued since March 2020, but was unaware of OTDA's discriminatory policy deprioritizing applicants in public and subsidized housing. Ms. Baez's ERAP application is still pending, leaving her alarmed, confused, and helpless.

131.    On August 17, 2021, Ms. Baez notified NYCHA of her ERAP application. On October 7, 2021, Ms. Baez emailed NYCHA a second time to inform them of her ERAP application. Knowledge of Ms. Baez's ERAP application immediately put NYCHA on notice of her rental hardship and triggered NYCHA's duty to conduct an Interim Recertification based on her actual income.

132.    NYCHA did not conduct an Interim Recertification and instead based Ms. Baez's monthly rent payments on an annual income of $55,000 a year, which was significantly more than she made in both 2021 and 2022.

133.    On May 9, 2023, NYCHA filed a consumer debt lawsuit against Ms. Baez in New York State Supreme Court, New York County (Index No. 451263/2023) to recover $46,134.05 in rental arrears she allegedly accrued from between March 1, 2020, and November 25, 2022.

134.    Because of Defendants' discriminatory actions throughout the pandemic and the ensuing NYCHA lawsuit, Ms. Baez endured an extreme level of emotional distress and uncertainty over her ability to pay rent and remain in her home. Ultimately, this uncertainty compelled her to move out.

135.    Ms. Baez's prolonged pending status and NYCHA's lack of response with regard to the ERAP application contributed to her confusion and anxiety around the status of the application.

136.    On and after March 13, 2020, Ms. Baez lived in a household with an income at or below 80 percent of the AMI, experienced financial hardship due to the COVID-19 pandemic, was obligated to pay rent to NYCHA, and had accrued rental arrears. Under OTDA's guidelines, Ms. Baez not only qualified for ERAP, but should have been prioritized within the first 30 days. Despite applying soon after the application opened and meeting the priority requirements, she was left

pending for more than two years, and remains so as of the filing of this Complaint. OTDA deprioritized her application because of her status as a NYCHA public housing resident in violation of state and local law.

*Siide Gil-Frederick*

137.    Plaintiff Siide Gil-Frederick currently lives in the Jacob Riis Houses, a NYCHA development, at 118 Ave. D, Apt #12I, New York, New York, with her 10-year-old daughter. Ms. Gil-Frederick-Frederick is a United States Citizen of African American descent and has lived in NYCHA housing since 1981.

138.    In 2007, NYCHA relocated Ms. Gil-Frederick from Washington Houses to Jacob Riis houses. Ms. Gil-Frederick requested the relocation to comply with NYCHA income guidelines, after obtaining a job as an investigator for the New York City Human Rights Administration ("HRA") in 2007. Ms. Gil-Frederick moved to her current address on April 4, 2020, right at the start of the COVID-19 pandemic.

139.    In November 2021, Ms. Gil-Frederick was diagnosed with breast cancer and began treatment at Memorial Sloan Kettering Hospital. This illness forced Ms. Gil-Frederick to take medical leave from her job to undergo her cancer treatments. Her treatments, on top of the various financial difficulties caused by the COVID pandemic, prevented Ms. Gil-Frederick from paying her rent. Because of that, NYCHA alleged she accrued $42,894.45 in rental arrears as of December 1, 2023.

140.    Since then, because of her illness and treatments, Ms. Gil-Frederick has been unable to return to work on a permanent and consistent basis and has relied primarily on limited disability income and inconsistent child support. She attempted to provide documentation regarding this

ongoing financial hardship but had limited access to NYCHA's online self-service portal and received little to no assistance from NYCHA.

141.    On June 7, 2021, Ms. Gil-Frederick applied for ERAP assistance after learning about ERAP through a tenant advocacy group. Ms. Gil-Frederick applied on the opening day of the application, after learning that ERAP would be available on a first come, first served basis. Ms. Gil-Frederick was hoping to cover rental arrears that accumulated starting in April 2020. She was not aware of OTDA's discriminatory policy deprioritizing applicants in public and subsidized housing. As of November 2023, the application was still pending.

142.    On July 2, 2021, Ms. Gil-Frederick notified NYCHA of her ERAP application via email. On July 2, 2021, NYCHA confirmed receipt of Ms. Gil-Frederick's ERAP application. Knowledge of Ms. Gil-Frederick's financial hardship by way of her application immediately put NYCHA on notice of her hardship, and triggered NYCHA's duty to conduct an Interim Recertification based on Ms. Gil-Frederick's actual income.

143.    NYCHA did not conduct an Interim Recertification and instead based Ms. Gil-Frederick's monthly rent payments on her annual income statements from before the pandemic, which represented significantly higher income than she earned in both 2021 and 2022.

144.    Because of Defendants' discriminatory actions throughout the pandemic, Ms. Gil-Frederick endured an extreme level of emotional distress and uncertainty over her ability to pay rent and remain in her home. She faced this emotional distress while undergoing cancer treatments, caring for her daughter, and dealing with the added uncertainty and trauma of the COVID-19 pandemic.

145.    At one point, a NYCHA official came to Ms. Gil-Frederick's door and verbally told her that her ERAP payment would remove $25,000 from her rent statement. Ms. Gil-Frederick had not received any other updates from OTDA or NYCHA regarding her application at that point.

146.    On her December 2023 bill statement, $17,703.40 had been removed from Ms. Gil-Frederick's owed rent, such that she owed $25,191.05. Still, Ms. Gil-Frederick received no information from OTDA or NYCHA and was left confused as to how much back rent she owed.

147.    Finally, on March 1, 2024, Ms. Gil-Frederick received confirmation via e-mail that her ERAP application was approved. OTDA claimed that $18,320 was issued to NYCHA on November 13, 2023, to cover rent owed from April 2022 to April 2023.

148.    NYCHA still fails to properly recertify Ms. Gil-Frederick's rent to accurately reflect her changed circumstances.

149.    OTDA's discriminatory deprioritization, which lasted for years, along with NYCHA's failure to properly recertify Ms. Gil-Frederick's income, contributed to her significant financial hardship during the pandemic, and made it more difficult for her to catch up on her rental payments.

150.    Ms. Gil-Frederick's prolonged pending status and NYCHA's inconsistent communications with Ms. Gil-Frederick also contributed to the confusion and anxiety around the status of her application.

151.    On and after March 13, 2020, Ms. Gil-Frederick lived in a household with an income at or below 50 percent of the AMI and lived in a community that was disproportionately impacted by COVID-19 according to ZIP code. Under OTDA's guidelines, Ms. Gil-Frederick not only qualified for ERAP, but should have been prioritized within the first 30 days. Despite applying on the first day and meeting the priority requirements, she was left pending for more than

two years. OTDA deprioritized her application because of her status as a NYCHA public housing resident in violation of state and federal law.

_Danielle Johnson_

152.    Plaintiff Danielle Johnson currently resides at 25-44 97th Street in East Elmhurst, Queens, New York. Ms. Johnson is a United States Citizen of African American descent.

153.    From 1993 to 2021, Ms. Johnson resided in the Astoria Houses, a NYCHA development, at 4-24 Astoria Blvd., Apt #3F, Astoria, Queens, New York. Ms. Johnson's husband lived with her until 2015, when he passed away from cancer. Ms. Johnson's son and daughter grew up in the apartment, and her daughter had moved out by 2020.

154.    On or after April 2020, Ms. Johnson was laid off from her job as a medical biller. Around this time, Ms. Johnson also became infected with COVID-19. Ms. Johnson's son was also temporarily without income.

155.    Ms. Johnson filed for and collected unemployment benefits after losing her job. Ms. Johnson reported this change in her household income during her Annual Recertification in compliance with NYCHA procedure.

156.    To file her Annual Recertification, Ms. Johnson would typically visit the property management office located at 4-20 Astoria Boulevard, Astoria, Queens, New York, to work with a NYCHA employee directly.

157.    Throughout her time living in Astoria Houses, Ms. Johnson experienced unsafe conditions, including mold, falling debris, and potential exposure to asbestos, that affected her and her family's quality of life, which increased in severity during the pandemic.

158.    Ms. Johnson filed several tickets and contacted the property management office requesting service to address these issues between 2020 and 2021, but NYCHA closed out the

tickets without resolution. As a result, the conditions continued to worsen throughout the pandemic, to the point where Ms. Johnson felt it was unsafe for her and her family to remain in the apartment.

159.    Ms. Johnson moved to 97-20 57th Ave, Apt #10B, Corona, Queens, New York on or around June 2021. The property was a market-rate rental unit. Ms. Johnson later moved to her current address on or around June 2023, and has lived there since. The property is a market-rate rental unit.

160.    On May 11, 2023, NYCHA brought a consumer debt lawsuit against Ms. Johnson in New York State Supreme Court, New York County (Index No. 451277/2023), to recover $28,071.79 in rental arrears she allegedly accrued from between January 1, 2020, and September 27, 2021. Ms. Johnson did not receive notice of this lawsuit until on or around December 12, 2023.

161.    Despite residing in a NYCHA development and putting NYCHA on notice of her job loss and financial hardship caused by the pandemic, NYCHA and OTDA failed to adequately inform Ms. Johnson of ERAP, which would have covered her rent and ensured NYCHA received the rent payments it is now seeking from Ms. Johnson.

162.    On and after March 13, 2020, Ms. Johnson lived in a household with an income at or below 80 percent of the AMI, experienced financial hardship due to the COVID-19 pandemic, was obligated to pay rent to NYCHA, and had accrued rental arrears. Under OTDA's guidelines, Ms. Johnson not only qualified for ERAP, but should have been prioritized within the first 30 days. But Ms. Johnson was never made aware of ERAP, and so did not apply. Ms. Johnson was chilled from applying because of her status as a NYCHA public housing resident in violation of state and federal law.

### Institutional Plaintiff's Facts

*Residents to Preserve Public Housing*

163.    Residents to Preserve Public Housing (RPPH) is a citywide, resident-led group of public and subsidized housing resident leaders, including members of the NYCHA Citywide Council of Presidents (CCOP) board.

164.    At least one member of RPPH met the eligibility requirements for ERAP assistance and was chilled from applying, or applied and was left pending indefinitely or for two years.

165.    RPPH's mission is to preserve public housing by advocating for adequate funding, improving quality of services, and increasing residents' decision-making authority. Specifically, RPPH has expended resources advocating for increased funding to preserve and maintain NYCHA as a viable form of housing.

166.    In pursuit of their mission to preserve public housing, RPPH has been fighting against the NYC Public Housing Preservation Trust ("Trust") and the Permanent Affordability Commitment Together ("PACT") programs. The PACT program puts NYCHA developments under private management. The Trust, first proposed during the pandemic, would allow NYCHA to transfer developments into a publicly-controlled Preservation Trust, which would be able to issue bonds and borrow money for repairs. However, there was no clear assurance that the NYCHA campus would not become private if it defaulted on the trust.[119] Both programs would convert Section 9 residents to Section 8, which would move residents into the private housing market.[120]

---

[119] Tim Murphy, *Could NYCHA Really Fall into Private Hands?*, City & State (July 18, 2022), https://www.cityandstateny.com/policy/2022/07/could-nycha-really-fall-private-hands/374561/.

[120] Tatyana Turner, *NYCHA Plan to Put Units Under Private Management is More Than Halfway Done—But Skepticism Persists,* City Limits (Apr. 4, 2023), https://citylimits.org/2023/04/04/nycha-plan-to-put-units-under-private-management-is-more-than-halfway-done-but-skepticism-persists/.

167.    NYCHA residents must vote to join one of these programs, however, only 20 percent of the heads of households need to vote for the election to be valid.[121] Thus, it was crucial that RPPH be able to raise awareness and spread their message so tenants could make an informed decision. However, the pandemic's unprecedented financial and emotional impact made such advocacy extremely difficult.

168.    ERAP presented a source of funding that could have helped preserve and maintain NYCHA as a viable form of housing for residents who could not otherwise afford rent due to increased hardship during the COVID-19 pandemic. Defendants frustrated RPPH's efforts to promote increased funding to NYCHA, as Defendants' implementation of ERAP prevented such funding from reaching NYCHA residents.

169.    Further, during the COVID-19 pandemic, many of RPPH's members lost the ability to pay rent, which was made worse by both NYCHA's failure to timely recertify household income and the lack of ERAP assistance provided as a result of OTDA's deprioritization policy. With so many members forced to deal with increased financial and emotional hardship, RPPH was not able to operate at its fullest capacity. Specifically, Defendants hindered RPPH's ability to spread awareness about and protest against PACT and the Trust while the programs were being voted on and actively implemented. Defendants' policies practically diverted resources away from RPPH's fight against the privatization of public housing.

**CAUSES OF ACTION**

**First Cause of Action**
**(Violation of Fair Housing Act, 42 U.S.C. § 3601 et seq.)**
***On Behalf of All Plaintiffs***

---

[121] David Brand, *Under New Election Rules, 20% of Households Could Determine Fate of NYCHA Developments*, City Limits (Dec. 12, 2022), https://citylimits.org/2022/12/12/under-new-election-rules-20-of-residents-could-determine-fate-of-nycha-developments/.

170.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

171.    Defendants' implementation of ERAP constitutes a denial of housing, discrimination in the terms, conditions, or privileges of rental of a dwelling, and publication of notice, statement, or advertisement with respect to rental of a dwelling that indicates discrimination on the basis of race and national origin in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and 3604(c).

172.    Defendant OTDA's policy of categorical deprioritization of Plaintiffs' applications for ERAP assistance, and all acts and practices in support of such policy, inflict disproportionate harm, both by intent and impact, on Black and Hispanic or Latino renters as compared to similarly situated White renters. The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a deprioritization policy of public and subsidized housing tenants.

173.    As a result of Defendant OTDA's policies, Plaintiffs and their families have been denied the opportunity to avail themselves of a federal housing program (i.e., emergency housing rental assistance for economic hardship caused by the COVID-19 pandemic) which was intended to support those most at risk of homelessness throughout the pandemic.

174.    Further, Plaintiffs who did not receive timely ERAP assistance because of their status as public or subsidized housing tenants now face substantial rent-related debt — at least 12 months of which could have been paid for with ERAP assistance — and potential eviction from their rental housing units. Based on the demographics of the market-rate and subsidized rental housing markets in New York City and New York State, Defendants knew or should have known

that Black and Hispanic or Latino families would be disproportionately and disparately impacted by this policy.

175.    Defendant OTDA's deprioritization policy constitutes discrimination in violation of the Fair Housing Act, as amended 42 U.S.C. § 3604, and its implementing regulations in that:

a.    Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or national origin, in violation of 42 U.S.C. § 3604(a), both by intent and impact; and

b.    Defendant's notices and statements have conveyed and continue to convey a race and/or national origin-based discriminatory preference in violation of 42 U.S.C. § 3604(c).

176.    Plaintiffs are aggrieved persons as defined in 42 U.S.C. §§ 3602(d) and (i). They have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

**<u>Second Cause of Action</u>**
**(Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.)**
***On Behalf of All Plaintiffs***

177.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

178.    Under Title VI of the Civil Rights Act of 1964, "no person shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

179.    New York State's ERAP program clearly receives Federal financial assistance under Title VI, as the program was primarily funded by grants of federal funds by the U.S. Department of the Treasury.

180.    As a grantee, New York State was directed by the U.S. Department of the Treasury not to refuse to provide assistance to households on the basis that they occupy subsidized properties

or receive subsidies, due to the disproportionate effect such a refusal could have on populations intended to receive federal assistance and the potential for such a practice to violate federal law.

181.    Defendant OTDA's systematic deprioritization of "occupants of federal or state funded subsidized public housing authorities or other federal or state funded subsidized housing" was intentional exclusion, denial of benefits, and discrimination on account of Plaintiffs' race and national origin that resulted in disproportionate harm as compared with similarly situated White renters.

### Third Cause of Action
**(Violation of New York State Human Rights Law, N.Y. Exec. Law § 296)**
***On Behalf of All Plaintiffs***

182.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

183.    Under N.Y. Exec. Law § 296, "it shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation . . . to discriminate against any person because of race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, age, disability, or lawful source of income or familial status."

184.    Defendant OTDA's policy of categorical deprioritization of Plaintiffs' applications for ERAP assistance, and all acts and practices in support of such policy, inflict disproportionate harm, both by intent and impact, on Black and Hispanic or Latino renters as compared to similarly situated White renters. The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a deprioritization policy of public and subsidized housing tenants.

185.    Defendant OTDA's policy of categorical deprioritization of Plaintiffs' applications for ERAP assistance, and all acts and practices in support of such policy, inflict disproportionate

harm, both by intent and impact, based on their lawful source of income. The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendants' implementation and enforcement of a deprioritization of ERAP assistance for public and subsidized housing tenants.

186.    As a result of Defendant OTDA's policies, Plaintiffs and their families have been denied the opportunity to avail themselves of a federal housing program (i.e., emergency housing rental assistance for economic hardship caused by the COVID-19 pandemic) which was intended to support those most at risk of homelessness throughout the pandemic.

187.    Further, Plaintiffs who did not receive timely ERAP assistance because of their status as public or subsidized housing tenants now face substantial rent-related debt — at least 12 months of which could have been paid for with ERAP assistance — and potential eviction from their rental housing units. Based on the demographics of the market-rate and subsidized rental housing markets in New York City and New York State, Defendant OTDA knew or should have known that Black and Hispanic or Latino families would be disproportionately and disparately impacted by this policy.

188.    Based on the explicit category of applicants it excluded, Defendant OTDA knew or should have known that tenants whose lawful source of income included federal subsidy would be disproportionately and disparately impacted by this policy.

189.    Defendant OTDA's acts, policies, and practices constitute discrimination in violation of the N.Y. Exec. Law § 296, and its implementing regulations in that:

a.  Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or national origin, in violation of N.Y. Exec. Law § 296;

b.  Defendant's acts, policies, and practices have made and continue to make housing unavailable to public and subsidized NYCHA residents, which is a source of income discrimination, in violation of N.Y. Exec. Law § 296;

c.  Defendant's acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race and/or national origin, in violation of N.Y. Exec. Law § 296;

d.  Defendant's acts, policies, and practices provide different terms, conditions, and privileges of rental housing to public and subsidized NYCHA residents, which is a source of income discrimination, in violation of N.Y. Exec. Law § 296;

e.  Defendant's notices and statements have conveyed and continue to convey a race and/or national origin-based discriminatory preference in violation of N.Y. Exec. Law § 296; and

f.  Defendant's notices and statements have conveyed and continue to convey an income-based discriminatory preference in violation of N.Y. Exec. Law § 296.

190.    Plaintiffs are aggrieved persons as defined in N.Y. Exec. Law § 296. They have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

### Fourth Cause of Action
#### (Violation of Fair Housing Act, 42 U.S.C. § 3601 et seq.)
#### *On Behalf of All Plaintiffs*

191.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

192.    Defendant NYCHA's engagement in a pattern and practice of failing to timely and/or accurately reduce Plaintiffs' rent to account for a reduction in household income or composition, resulting in a rent charge of more than 30 percent of their income in violation of federal law, constitutes a denial of housing, and discrimination in the terms, conditions, or

privileges of rental of a dwelling, on the basis of race and/or national origin in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (b).

193.    Defendant NYCHA's failure to timely recertify Plaintiffs' household incomes, and all acts and practices in support of such policy, inflict disproportionate harm, both by intent and impact, on Black and Hispanic or Latino renters as compared to market rate renters. The disproportionate harm experienced by Plaintiffs is the direct and immediate consequence of Defendant's failure to recalculate their rental payments in compliance with federal regulation.

194.    As a result of Defendant NYCHA's policies, Plaintiffs and their families have been overcharged for monthly rent and accrued rental arrears that reflect an incorrectly calculated amount. This practice has placed Plaintiffs at increased risk of eviction. Some have moved out of their NYCHA properties, and even out of state in search of more affordable housing.

195.    With lawsuits being continuously filed by Defendant NYCHA seeking miscalculated rental arrears ranging in the tens of thousands of dollars, Plaintiffs and their families have been subject to increased emotional and economic stress, compounding the harm inflicted by NYCHA's failure to recertify their household incomes.

196.    Based on the demographics of its residents, Defendant NYCHA knew or should have known that Black and Hispanic or Latino families would be disproportionately and disparately impacted by this policy.

197.    Defendant NYCHA's policies constitute discrimination in violation of the Fair Housing Act, as amended 42 U.S.C. § 3604, and its implementing regulations in that:

a.   Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or national origin, in violation of 42 U.S.C. § 3604(a), both by intent and impact; and

b.  Defendant's acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race and/or national origin, in violation of 42 U.S.C. § 3604(b), both by intent and impact.

198.    Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602(d) and (i). They have been injured by Defendant NYCHA's discriminatory conduct and have suffered damages as a result.

**Fifth Cause of Action**
**(Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.)**
*On Behalf of All Plaintiffs*

199.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

200.    Under Title VI of the Civil Rights Act of 1964, "no person shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

201.    NYCHA clearly receives Federal financial assistance under Title VI, as it receives a majority of its annual funding through grants of federal funds by the U.S. Department of Housing and Urban Development.

202.    As a public housing authority, NYCHA is required to conduct Annual and Interim Recertifications taking into account residents' notice of hardship pursuant to U.S. Department of Housing and Urban Development regulation.

203.    Defendant NYCHA's failure to timely recertify Plaintiffs' household income in accordance with federal regulation was intentional exclusion, denial of benefits, and discrimination on account of Plaintiffs' race and national origin that resulted in disproportionate harm to Black and Hispanic or Latino renters.

**Sixth Cause of Action**

**(Negligence)**
***On Behalf of All Plaintiffs***

204.    Plaintiffs repeat and incorporate by reference all allegations set forth in Paragraphs 1 through 169 above.

205.    Defendant NYCHA owed public and subsidized residents a duty to initiate the Interim Recertification process according to HUD regulation.

206.    Public and subsidized NYCHA residents triggered the Interim Recertification process by providing notice to Defendant NYCHA of pandemic-related economic hardship, or of their ERAP application materials, which by implication indicated pandemic-related economic hardship.

207.    Defendant NYCHA breached its duty to public and subsidized residents by failing to initiate the Interim Recertification process upon notice of residents' pandemic-related economic hardship and upon receipt of ERAP application materials.

208.    Defendant NYCHA's failure to initiate the Interim Recertification process caused residents to be charged a greater amount in monthly rent than is allowed by regulation for extended periods of time.

## DEMAND FOR JURY TRIAL

209.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek from this Court:

a.    An order declaring that Defendants' acts, policies, and practices complained of herein violate Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 et seq.;

b.  An order declaring that Defendants' acts, policies, and practices complained of herein violate Plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;

c.  An order declaring that Defendants' acts, policies, and practices complained of herein violate Plaintiffs' rights under the New York State Human Rights Law, N.Y. Exec. Law § 296;

d.  An injunctive order requiring Defendants, their agents, employees, successors, assigns, and those acting in active concert, combination, or participation with them, to take all affirmative steps necessary to remedy the harmful effects of the unlawful and discriminatory conduct and to ensure that future housing programs and housing rental assistance programs comply with the law;

e.  An injunctive order prohibiting Defendants, their agents, employees, successors, assigns, and those acting in active concert, combination, or participation with them from evicting individual Plaintiffs or collecting rental arrears from individual Plaintiffs whose ERAP applications were chilled, wrongfully denied, were left pending for more than two years, or continue wrongfully to be classified as pending;

f.  An injunctive order requiring Defendant NYCHA to properly recalculate rental arrears for Plaintiffs whose rent reflected an incorrectly calculated amount after March 13, 2020, and apply the correct amount retroactively;

g.  Compensatory damages equal to the amount determined by jury as necessary to provide full compensation to Plaintiffs for their injuries suffered as a direct result of Defendants' discriminatory conduct alleged herein;

h.  Punitive damages as provided by 42 U.S.C. § 3613(c)(1) and N.Y. Exec. Law § 297(4)(c);

i.   Attorneys' fees, costs, expenses, and interest incurred in prosecuting this action pursuant to 42 U.S.C. § 3613(c)(2) and N.Y. Exec. Law § 297(10);

j.   Such other relief as this Court deems appropriate.

Dated: April 30, 2024                    Respectfully submitted,

Norrinda Brown Hayat
Lincoln Square Legal Services, Inc.
150 West 62nd Street, 9th Floor
New York, New York 10023
Tel. (212) 636-6934
Email: nbrownhayat@lsls.fordham.edu


*Attorney for Plaintiffs*